Good morning, Your Honors. My name is Leslie Smith and I am representing the Securities and Exchange Commission. The Commission is the first appellant in this cross-appeal, which is a very unusual position for us, but we think it's important to try and understand to determine. Counsel Richard, please keep your voice up. It's a little difficult to hear you. Okay. The Commission charged Paul Rubera, who is the president and owner of Alpha Telcom, a telephone services company, and who controlled ATC, a telephone sales company, with perpetrating a fraud on investors in a pay telephone program. From 1997 to August 2001, the program raised more than $130 million from 7,000 investors, a huge amount of money. Unfortunately, Alpha was operating as a fraudulent Ponzi scheme, paying off early investors, not with profits or returns, but with new investor money. It operated at a loss during the whole period until Alpha stopped paying payments to investors and the whole enterprise collapsed. The investors lost all their capital. Counsel, what is our standard of review on the issue that you are appealing, on the lack of science or determination by the district court? We have to show that it's clearly erroneous, Your Honors, that a mistake was made, if you look at the whole record. The district court found that interest in the program were securities and that Rubera was liable for illegally selling securities, but notwithstanding the Ponzi scheme and the misrepresentations, he ruled that Rubera did not have the scienter to be liable for this fraud. That is, he neither knew that the representations that were being made were false, nor was he recklessly indifferent as to their truth or falsehood. Wasn't there disputed evidence on that issue? Disputed evidence? Yeah. Did Mr. Rubera's defense indicate he was not aware of the Ponzi scheme, he had no knowledge of fraudulent representations, he did not conduct the day-to-day operations of the company? Didn't he offer that evidence? Well, it isn't really evidence. The only evidence that was offered was that some of the people, because Rubera took the Fifth Amendment, then some of the people made a lot of statements. Yes, and that's evidence, isn't it? Yeah, well, yeah, I think a lot of it's hearsay. Did you object on that ground? Did you or whoever put the case on the law? I'm not certain. I couldn't find any objection. I agree with you that some of it was hearsay, some of it was conclusory, but there's no objection. But we think even if the evidence was in, that when the court looks at it and sees the rest of the evidence in the record, it will determine that he made a mistake in picturing Rubera the way that he did, because there's so much other evidence of activities that show that he did have scienter. Is it enough for us to determine that the district court made a mistake? Well, that's just the standard from the way the case is put. It's clearly a conviction. That's what it is, a conviction that a mistake has been made. And we do ask this court to hold that the district court made a clear error in finding that he didn't have scienter, a mental state embracing intent to deceive, manipulate. You're saying the district court could not consider the evidence offered by the defense? I did not say that. Well, there was evidence offered by the defense. He didn't have knowledge. He didn't commit a fraud. He didn't make a misrepresentation. He didn't run the business on a day-to-day basis. Isn't that true? Isn't that true that that's the evidence in this case from the defense? As I said, I don't think a lot of that is evidence, but there is some in the form of testimony from people. If you don't object to hearsay or a conclusion, the court can consider that. Isn't that true? We have not asked for the court not to consider that. We've asked that they look at the whole record and look at what the district court found and see what we've brought up as what also was in the record or what other conclusions he might have drawn and decide that he made an error. And weigh the evidence in your favor rather than in Mr. Ribeiro's favor. Is that what you want us to do? Well, I never thought of the standard of clear error as being you have to weigh the evidence. But if you do, then this case would illustrate that, the evidence and some of the legal conclusions. Let me ask the question this way, counsel. If a trial judge weighs the evidence, conflicting evidence, and makes a determination on that evidence, isn't that pretty much bulletproof from a clear error finding? I don't think so. I thought that's what clear error meant. What's your best case authority for the proposition that once a district court judge has weighed conflicting evidence, the clear error standard can still result in a reversal of the rule? What's your best case authority for that proposition? I'm sorry, Your Honor. I believe that it's true. I believe we have no case in our papers that says that. And I never thought of it that way. I thought it applied specifically to findings in trial, which is usually what the district court has found. But it's more difficult when there's conflicting evidence in the record and the district court has weighed the evidence and has come to a resolution on the evidence. It's very difficult to find clear error in that context. I was just wondering if you have a case that you could cite us to where there has been an example of the district court weighing conflicting evidence and nevertheless being overturned on a clear error standard. I'm sorry. I don't have that. I know that it isn't just a matter. I mean, what they say about the standard is, well, you can't just say, I would have made another finding. I'd rather do it the other way. You don't do that. But when it gets so obvious that the wrong decision's been made, that's exactly where the appeal court may step in and say there's been a clear error made. But I don't have an example of a case where that is done. Counsel, Mr. Ribeiro was charged with civil fraud. Is that correct? This is not criminal charges. We were going to end up paying fines if he was found guilty of civil fraud. What was the government's burden in order to prove civil fraud in the court below? I believe it's a preponderance of the evidence. Is it just preponderance? It's not clear and convincing evidence? No. The commission accused Ribeiro of making serious misrepresentations and omissions. The promotional brochure said that the investment was low-risk and safe and practically recession-proof. And it touted Alpha as a very profitable company and that the payphone industry was profitable. The telephone purchase agreement said you can have a buyback. You can bring your telephone back and ATC repurchased it for the original price. And there was supposed to be buyback insurance. But all of these things were false and misleading representations. The investment was certainly not safe or profitable. Ribeiro himself knew that in the previous five years, the industry in general and his Alpha in particular, their profits had declined 50%. He insisted on paying investors the $58.34 per month, no matter what revenue their phones brought in. But he was actually paying, and Alpha was paying it out of new investor payments, not out of returns or profits, of which there weren't any. The revenues from the program were less than its expenditures and much less than total expenditures. So it had to be that the new investors were being used, their payments were being used to earlier investors, as the district court and the commission's expert at the trial was survivably found. Ribeiro states in both of his briefs that Barclay said that Alpha's revenues fell short of covering expenditures by only $100,000 out of $21 million and that surely they could have made up all the expenditures that they had. But this is really flatly wrong. What Barclay said was that even a $100,000 loss shows you're not able to give anyone payments out of profits or out of returns. And in addition, there was another $31 million in expenditures for overhead that hadn't gotten counted in at that point, which puts Alpha really deeper in debt and less able to pay the $17 million in payments to the investors. As for the buybacks, Ribeiro himself went to the accountants who were doing the financial statements in 1999 and they looked it over and informed him that the buybacks created a problem with revenue recognition. The company had taken on an obligation, a significant obligation in the future, and there was no historical evidence as to how many people would try to have those buybacks. And they recommended that, they said, generally accepted accounting principles require you to account for this as a liability. And when they calculated that, the company's financial statements went from being a slightly modest profit to being $2, $3, $4 million in the red. He must have known from his experience that his firm was not in a position to be guaranteeing universal buybacks. He was very familiar with the promotional materials by which investors were brought into this scheme. A knowing participant as both the owner and the control person and also because he was one of the few people at Alpha that had the responsibility of reviewing promotional materials. Each investor would receive a brochure and a telephone services agreement and a telephone sales agreement. The Ribera's briefs say that he was not familiar with these materials and he did not review them and approve them. But the record shows that he did. Alpha's vice president and general manager for three and a half years, David Winstead, testified that he and Ribera had the responsibility at Alpha along with counsel to review the brochures and the other promotional materials. He particularly remembered going over and reviewing that brochure with Ribera about the payphone industry and the benefits. What's the evidence presented to counter that very factual assertion? Did Mr. Winstead testify that he didn't approve or no of the statements in the brochure and to his knowledge Mr. Ribera did not approve or no of the statements? Isn't that part of the record? I mean, isn't it? It's certainly part of the record. What I think happened was in the declaration that Winstead made after this testimony, the first testimony is extremely detailed and goes on and on about all the things they reviewed together. And then in the declaration, he says, well, I can't really say positively that he did that except for the paragraph 11, which is the paragraph about this going over the brochure together. So if you believe the other side's evidence is being better than Winstead, you might think that, well, you'd have to think that he reviewed the brochure because he said that in both of his statements. But the district court, having considered the declaration under oath under penalty of perjury, could have believed Mr. Winstead's statement. Isn't that true? Well, which one? I mean, he could have believed that that you're reading. Either one. He could have believed the other ones that say we reviewed it together. Yes. Yeah, but we have to view the evidence in light most favorable to Mr. Ribera on your appeal, don't we? I'm not sure about that. If we've appealed because we think that the facts were found clearly erroneously, then I don't think that you lean in one direction toward the other. Are you saying that an appellate court doesn't have to view the evidence in the light most favorable to the other side, that one below? Well, Your Honor, I think that's fine. I think it's so clear in this record that he has to enter and that he wasn't well during all these activities. He knew a lot about the company. He wasn't charged. So that even if you view it in the light most favorable to the other side, it would still show you that a mistake was made. He also reviewed the agreements with SPA and other personnel. And no one said that he didn't. I think the evidence shows clearly that he was familiar with the promotional materials and reviewed them and permitted them to be used. He also knew more about Alpha's financial situation than almost anyone else. He did weekly reports on foreign revenue, talked with the financial staff, gathered the bills together and decided which bills would be paid. He really was a hands-on manager. At the same time, he was more expensive, from HEC. When he was outside of Oregon, he almost always conducted weekly management meetings by phone. They kind of whittled that down in the briefs. But the fact is that when Seth testified, it was rare for him not to be doing that. He had his own agenda. He had to touch. Contrary to what the briefs say, he really wasn't charged. Rivera was the one who determined that Alpha would pay every investor 58.34, no matter what the revenues from the phone were. He decided on the split between the 30 and 70 percent revenues. Contrary to the district court's picture of him, Alpha had the knowledge and the control and the participation in the fraudulent activities to be held liable. Other instances also revealed Rivera's standard. When he was talking with the accounting firm and they told him that the buybacks were a problem and he had to take an accounting according to GAP that would show great losses, he resisted and said, no, I don't think there will be very many buybacks. Are you going to save time to respond to the cross-appeal? Actually, I would like to do that, John. Thank you, counsel. Good morning. May it please the court. Counsel, my name is Douglas Stringer. I'm an attorney with the firm of Garvey Shubert Behr. I'm accompanied this morning by my colleague, Adam Kelly, seat of the council table, representing Paul Rivera in this matter. I can quickly attempt to shed some light on the procedure used in the trial court below. This was something I'd considered raising and have decided now to mention this in light of some comments made during the SEC's opening remarks. On the record on the appeal, the record in this case consists of a great number of SEC sworn statements, if you will, statements obtained by the SEC during the course of an investigation that are one-sided in that Mr. Rivera or no other party is present. The SEC exercises its subpoena powers, brings a witness in, takes what's essentially a deposition resulting in a written or a transcribed deposition transcript. Many of those form part of the record on this appeal. Did you object to that process? No, Your Honor. From our side, and I wasn't involved at the trial court level, then Mr. Rivera tendered affidavits. In order to supplement the record that existed, the affidavits were then tendered to the district court. And the district court then allowed both parties, it's my understanding, to call witnesses who could come then and testify on cross-examination so that any challenged assertions could be subject to cross-examination before the court as part of the trial. There were a small number of live witnesses, I believe, who testified on direct and cross. But for the most part, that's how the record was assembled. And it's certainly, I'm not aware that in the pleadings or certainly as an issue in this appeal that the SEC has identified any particular piece of evidence relied upon by the trial court as being flawed or subject to hearsay or not otherwise a part, shouldn't be a part of the record. I am going to try to reserve some time to come back to speak to the legal issue that's before the appeals panel, which is the whether it's a securities issue, that's the appeal issue raised by Mr. Rivera as the appellant. As to the fraud issue, Your Honors, the standard of review here is that the SEC had the burden of proving scienter, that is a fraudulent intent to deceive or manipulate or to defraud on the part of Mr. Rivera, a mental state that encompasses both knowing conduct and also reckless conduct that constitutes a dramatic departure from standard or acceptable practice. What was the standard of proof? Was it clear and convincing or preponderance? Your Honor, I believe in terms of the standard that was applied by Judge Panner below, I don't know that he says in the opinion one way or another the standard that was applied. It would be our assertion that the standard here would be a higher standard, that of clear and convincing evidence that ought to be applied, although I'd hasten to add that in our view the trial court could easily have found the way it did, even applying a preponderance of the evidence standard. Certainly as the case now presents itself to this appeals chamber, the issue was whether based on what's in the record whether Judge Panner was clearly wrong in ruling that the SEC had failed to establish the requisite mental state, and the record amply establishes that Judge Panner was not clearly wrong. We can parse about in terms of what the facts of this case are or aren't, but the fact is that if the appeals chamber goes to the record and looks at the record references and studies and analyzes the facts of this case, you're going to find that Judge Panner had every reason to rule against the SEC on the fraud issue. Mr. Rivera, by virtue of his position in these companies and by virtue of his conduct, has been permanently enjoined. He has been ordered by Judge Panner to disgorge profits, I think, of over $3 million. He has not emerged from the district court proceedings unscathed. The only issue that's before the Court, however, is whether he should now also be held responsible for these third-tier civil penalties that the SEC would urge the order against Mr. Rivera in the event that it's found that Judge Panner was clearly erroneous in ruling that it had failed to carry its burden of proving fraud. I can quickly touch on some of the factual elements of this question that were raised during the SEC's opening argument. There are a number of facts which are not, in our view, seriously in dispute. Mr. Rivera had no prior experience in the securities field at all times. His efforts were directed toward the acquisition, the maintenance, and the servicing of the telephones. Sales, the marketing side, was never within his area of responsibility in terms of his function and daily involvement. That was initially a gentleman named Mr. Tomino, who stepped out in early 1999 and was replaced by Mrs. Kenison and Rambach, who, as the Court probably is aware, turned out to have had previous SEC enforcement actions against them. Rambach and Kenison, as Judge Panner found, were very, very much responsible for the ultimate demise of the Alpha Telecom payphone system based on their own improper conduct, of which Mr. Rivera did not have knowledge until it was too late. Mr. Rivera did not have direct contact with telephone purchasers. At the beginning of the program, he obtained legal advice from not one but two attorneys, one a nationally recognized securities lawyer in Florida, both of whom advised that the program was not a security. Mr. Rivera resided in Connecticut throughout the great period of time involved in this case. The headquarters of both Alpha and ATC, which was the actual entity selling the phones, were located in Grants Pass, Oregon. Judge Panner found, and the record amply supports the assertion, that the persons in Grants Pass running both of those entities were either incompetent, although well-meaning. None of those individuals, I think, except for Mr. McDonald, found themselves involved in this enforcement action. Well-meaning but incompetent, unable to keep up with the very rapid growth that this program experienced, and that- Mr. Stringer, how could a man who has raised $130 million and is running a corporation that has 700 people participating in its investment scheme and which is paying out the front door money that's coming in the back door not know what was going on? Well, my answer to that would be, first of all, it's not clear the extent to which money coming in the front door was being paid out the back door. It's perhaps not as evident in the briefs as it should be, but Alpha derived additional income from the phones, not related to the actual phone revenues, but from other services associated with the phones, such as advertising, something called dial-around, other ways that the phones generated business or generated income. This company made money and had other sources of income and cash that were independent and unrelated to the funds coming in from those persons who were buying the phones. In terms of what he knew, and this is one of the two areas that Judge Panner dealt with, the financial condition of the company, what did he know, and then secondly, the program provisions such as the sales materials. In terms of the financial condition, Mr. Rivera, as Judge Panner found, did not have any awareness of the likelihood or possibility that phone revenues were not sufficient to pay monthly payments to the investors that were going out. The SEC, in our view, mischaracterizes the record on that in one important respect on page nine of its opening brief, asserting that Mr. Rivera knew that the business was not profitable. In fact, the record reference that's given at that portion of the SEC's brief relates to testimony given by Mr. McDonald, who was not talking about Alpha's financial condition. Rather, he was talking about an industry-wide decline in revenues coming from paid telephones in general and how that had affected Alpha. Counsel for the SEC correctly stated that Mr. Rivera was aware of this industry-wide decline, but that certainly does not then provide the leap to the other assertion, which is Mr. Rivera knew that Alpha Telecom, in fact, was not profitable or was not able to generate sufficient funds to pay investors from phone revenues. There's no silver bullet on any of these points. It's all deeply embedded in facts that are in a very unwieldy record. But the fact is, Judge Panner, setting aside what Rivera knew, we know that this is what Mr. Rivera's people knew and said to the SEC. Renee Sinclair was an in-house accountant at Alpha. She stated that approximately 90 percent of the phones were profitable. Moreover, the business overall was always profitable. That's 542 of the supplemental excerpts. Mr. Cougar, the attorney in whom Mr. Rivera placed a great deal of trust and reliance, stated that he saw no evidence that new phone sales were needed to fund buyer's monthly payments. David Winstead, as the courts heard, was the general manager of Alpha. He stated that he believed that Alpha was profitable during the entire time he worked there. And then finally, David Raskin, who was a CPA who worked as an Alpha bookkeeper, rejected the assertion that was put to him in the course of his SEC statement, that this was a Ponzi scheme. He rejected that, so that in his observation, Mr. Rivera was doing everything he could to make the business a success. Finally, an outside accountant, Louis Olds, his financial valuation of Alpha is in the record. He was hired to do a valuation of Alpha for purposes of Mr. Rivera's marriage dissolution. On June 6th of 2001, which is just a couple months before the receiver was appointed, his valuation was provided to Mr. Rivera, and he valued Alpha at over $8.5 million in value. So, again, we can argue about what the evidence is or what it shows, but the fact is that there is ample evidence in the record to fully support Judge Panner's conclusions, that, in fact, Mr. Rivera did not possess fraud or fraudulent intent in respect to any knowledge that he may have had or not have had about the financial condition. Counsel, wasn't there evidence in the record that Mr. Rivera asked for the servant to disappear or take a nosedive? Yes, I'm aware of that, Your Honor. That came from Mr. McDonald, who was a latter general manager at ATC, which was a related entity, I believe. It's my understanding that, according to Mr. McDonald, that conversation, first of all, it's not clear exactly what was being asked of anything. I think any number of inferences or summations could be drawn from his characterization of that conversation. The conversation occurred in the early part of June after, I believe, after some level of enforcement had already begun or after, in fact, information and documentation had already been provided to the SEC. Judge Panner didn't rely on that. Judge Panner doesn't address that point in his opinion, and I think, again, Judge Panner is probably the person best situated to draw whatever inferences may or may not be taken from that sort of vague claim made by Mr. McDonald. If we were to take the most sinister connotation of that, that Mr. Rivera was asking that evidence be destroyed, would that be sufficient to establish the requisite mental state for fraud, in your view? No, Your Honor, it would not, because, of course, the fraud that the SEC has to prove relates over to the course of the period of time in which the program was being offered to investors, and at the time Mr. McDonald made his statement, the program was really in the final stages, I believe. A state enforcement action had occurred in Ohio, which had brought the sales at that point to a close. I'm at the five-minute mark, Your Honor, if I could. Rebuttal. Your Honor, I'm informed by my co-counsel, who was trial counsel, that I did mistake. The judge gave instructions that he would just, you know, take any objections. He would just filter out anything that was objectionable in the evidence, and that he didn't want people making objections. But we submitted pretty extensive written objections to all the testimony, so that I guess it was objected to at the time. But did he make a ruling on your written objections? No. Isn't that your duty, or trial counsel's duty, to get a ruling? Because we're at a telecourt, we can only act on rulings. Isn't that true? I'm not sure. I saw it as a situation where the judge hadn't continued with a particular instruction that he gave, and that it therefore would probably, there's no particular procedure for doing anything about it. So are you asking us to, by that statement, are you saying we should ignore all the conclusions in the hearsay in looking at this record? No.  The objections are in the record. There's no ruling on them. But I'm sure this court is more than capable of looking at material and understanding whether or not it's objectionable. I mean, a lot of this was no personal knowledge. In other words, if all the people who testified talk about what Rivera was thinking, the objection, no personal knowledge, goes in for all of those. The kinds of things that Rivera did that I think show his scienter, as opposed to just sort of not knowing anything and not realizing what's going on, are that there was, you know, in FIBAC insurance, they formed a captive insurance company in all four, and it was one-third owned by Rivera. And the arrangements for the excess insurance were that you've got to keep a $2 million level in the account in order for the excess insurance to kick in. And Rivera knew this very well. But there was a very, and he had this account, because Ann and W had very little capital, he had the account at ATC, which was the business he controlled. And during that terrible spring of 2001, he drained the account from $200 million down to almost $100,000. The bookkeeper spoke to him and said, you know, it has to be up there for the insurance. And he left it there, so that's really, you know, what happened is that when Alpha stopped making payments and the investors tried to file buybacks, there was no insurance, and there's nothing like $2 million in the account. And I consider that to be a sign of a person who's behaving with deception and, you know, intending to defraud other people. In the spring of 2001, Alpha sent a letter to its investors. This was they'd been borrowing a million dollars a week from ATC. And he let the fund go down and. Sorry, terrific cash flow problem. So they wrote a letter to their investors and it said the majority of May payments have been made and the remainder will be sent shortly. Now, that wasn't true, and he knew it wasn't true. It hadn't been made. And then he also said that they were trying to improve the automating the process so that they would be able to send payments on time every time. He hadn't made the June payments either, and he knew that. That level of communicating with your investors, talking as if everything was going to be fine when you knew at that point that the total collapse was less than a month away. I think shows clear. And I suppose the tipping over the server is similar. If it's not time constraint shows previous tendency. I'd like to just say a few words, but if I have 20 seconds, this is clearly an investment contract. There really are no arguments about it that detract from the fact that it has all three elements. And there's nothing that comes from the defendants. Arguments would cause you to think any different. Thank you, Counsel. Thank you, Your Honor. On the buyback, Counsel referred to the financial statement made by Perkins in which there was a departure from GAAP, generally accepted accounting principles, that was taken. The financial statement was made at the time when buybacks were running at about 3 percent within the company during 98, 99, and 2000. The buybacks did not take on the exponential rate that they did until later when the promoters, SPA people, were churning and encouraging investors to actually buy back the phones. So that at the time Mr. Rivera took the position that they were going to make the GAAP departure. In fact, it was well grounded based on his business experience that only 3 percent of the program purchasers were likely to ask for a buyback. On the insurance sinking fund, Rivera and everyone else in the company thought that it was $2 million and that fund was to be used as a deductible. And the funds in that account were used to pay or to fund buyback requests as they came in. Rivera was not a person exercising sole authority on that account and he wasn't the person making the transfers out of that account. That was being done by a Ms. Sinclair and another bookkeeper named Mary Barber. On the three minutes that I've got left, I would like to briefly turn to the legal issue that we've raised. If anything, perhaps to suggest that the appeals panel ought to hold off ruling until we see how the Supreme Court rules in the SEC against Edwards' case. Edwards was actually a district court case at the time Judge Panner ruled and Judge Panner relied on Edwards. Among other cases in ruling that the payphone investment program in this case was a security. After Judge Panner ruled, the 11th Circuit reversed that trial court decision in the SEC versus ETS case. There is a factual difference, isn't there, between this case and the Edwards case? In Edwards there was a promise of a fixed return. Here there was an agreement that 30 percent of the profits would be paid. Yes, Your Honor. There is, and actually in Edwards, and I've read the Supreme Court briefs, I believe the case was argued yesterday. There are two issues presented in Edwards. One is whether that fixed rate of return aspect of the contracts or the leases made the program, an investment contract or not. The other question, however, and I'm reading from the brief, is whether the investor, I'll start over, is an investment, not an investment contract, if the promoter promises a fixed rather than a variable return, or if the investor is contractually entitled to a particular amount or rate of return. Admittedly, the second issue there is probably the lesser one that the Supreme Court will be addressing. But that's where we think that there's certainly enough overlap between what was the practice in this case, contracts in which investors were assured of a minimum $58.34 a month. Are you aware that the common case from this circuit is, reached a different result from the Edwards case? Yes, Your Honor, I am aware of that, and that's why I'm suggesting, I think, that at the very least, there is a tremendous amount of similarity, certainly enough for the Court and perhaps the parties to need to consider the Supreme Court's forthcoming decision in Edwards before ruling. There's another reason why it's significant, and it goes to the control, which is the hawking against Dubois. I think that if the Supreme Court really decides to follow the Eleventh Circuit's view and to focus on the profit side, that's going to affect how the Ninth Circuit handles the control side under the unbanked decision in Dubois v. Hawking, because it's possible that the control could be minimized, if, in fact, this fixed rate of return or contractually assured return issue becomes important. And I think that's the reason why it's significant. Thank you, Your Honor. The case just argued stands admitted, and we are in recess for the day. All rise. This Court, for this session, stands adjourned. Thank you. Thank you. Thank you.
judges: Alarcon, Rawlinson, Bybee